113 T.C. No. 1


UNITED STATES TAX COURT


CMI INTERNATIONAL, INC. A MICHIGAN CORPORATION, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 24752-92.                    Filed July 13, 1999.

        P's wholly owned domestic subsidiary, D,
participated in a debt-equity-swap transaction in which
D exchanged an interest in Mexican U.S.-dollar-
denominated debt for stock in D's Mexican subsidiary.
On its consolidated 1988 tax return, P reported no gain
or loss relating to the swap transaction.  In the
notice of deficiency, respondent determined that P
recognized an $830,000 gain relating to the
transaction.
        <u>Held</u>:  Pursuant to sec. 367(a), I.R.C., and sec.
1.367(a)-1T(b)(3)(i), Temporary Income Tax Regs., 51
Fed. Reg. 17939, P did not recognize any gain.

<u>James P. Fuller</u>, <u>Kenneth B. Clark</u>, <u>Jennifer L. Fuller</u>,

<u>William F. Colgin</u>, <u>James E. Beall</u>, and <u>Joseph A. Ahern</u>, for

petitioner.

<u>Lewis R. Mandel</u>, and <u>Trevor T. Wetherington</u>, for respondent.


FOLEY, <u>Judge</u>:  By notice dated October 6, 1992, respondent determined a $291,011 deficiency in petitioner's 1988 Federal income tax.  The primary issue for decision is whether petitioner, pursuant to section 367(a), recognized gain relating to the swap transaction.  We hold petitioner did not.  All section references are to the Internal Revenue Code in effect for the year in issue.

FINDINGS OF FACT

In the 1980's, the Mexican Government created a "debt-equity-swap" (swap) program that was designed to encourage foreigners to invest in Mexico and reduce the outstanding balance of the Mexican Government's foreign-currency-denominated debt.  The program's swap transactions involved a series of prearranged steps that were accompanied by extensive documentation.  In these transactions, a U.S. investor could purchase an interest in the Mexican Government's U.S.-dollar-denominated debt and, in exchange for stock, transfer such interest to its Mexican subsidiary.[1]  The debt would then be canceled, and the Mexican Government would transfer pesos to the subsidiary.

---

[1] Compare <u>G.M. Trading Corp. v. Commissioner</u>, 121 F.3d 977, 979 (5th Cir. 1997), revg. 103 T.C. 59 (1994), supplemented by 106 T.C. 257 (1996), where the taxpayer transferred debt to the Mexican Government in exchange for pesos.

Petitioner is a Michigan corporation whose principal place of business was in Southfield, Michigan, at the time the petition was filed. Petitioner manufactures machined-cast automotive parts and is the parent company of a group of corporations that in 1988 filed a consolidated corporate income tax return.

In mid-1986, petitioner decided to build a plant in Mexico that would supply parts to Ford Motor Company. On June 5, 1986, petitioner formed a wholly owned domestic subsidiary, CMI-Texas, Inc. (CMI-Texas). In turn, on June 13, 1986, CMI-Texas formed a Mexican subsidiary, Industrias Fronterizas CMI, S.A. de C.V. (Industrias), which issued 4,996 shares of class A stock to CMI-Texas and one share of such stock to each of four individuals. In late 1986, Industrias began construction of an industrial plant in Nuevo Laredo, Tamaulipas, Mexico (Nuevo Laredo plant).

On April 30 and May 11, 1987, formal requests were made on behalf of CMI-Texas and Industrias for authorization to engage in a swap transaction to finance additional construction of the Nuevo Laredo plant. On August 7, 1987, the Mexican Government approved the transaction, authorizing CMI-Texas to acquire an interest in U.S.-dollar-denominated debt with a face value of US$2,300,000. On September 4, 1987, the Mexican Government approved a 15-percent discount rate, which would be used in calculating the amount of pesos to be transferred to Industrias. The discount rate reflected an estimate of the proposed venture's

impact on Mexico's economy (e.g., zero percent reflected the greatest benefit and 25 percent reflected the least benefit). On September 18, 1987, Mellon Bank (Mellon), selected by CMI-Texas as the financial intermediary, paid US$1,115,500 (i.e., reflecting the prevailing market discount rate of 51.5 percent) for an assignment of debt with a face value of US$2,300,000.

On October 1, 1987, the Mexican Government, CMI-Texas, Industrias, and Mellon entered into a Purchase and Capitalization Agreement (Agreement), which delineated the terms of the swap transaction. On October 15, 1987, Mellon informed all parties that the transaction would close on October 28, 1987. On October 21, 1987, CMI-Texas tendered US$1,125,000 (i.e., Mellon's cost of the debt, US$1,115,500, plus a US$9,500 commission fee) to Mellon.

On October 28, 1987, the parties simultaneously consummated the following transactions: (1) Mellon sold to CMI-Texas, for the previously tendered US$1,125,000, a 100-percent "undivided interest" in U.S.-dollar-denominated debt (debt interest) with a face value of US$2,300,000; (2) CMI-Texas transferred its debt interest to Industrias as an equity contribution; (3) Mellon canceled the debt interest and the underlying debt; (4) the Mexican Government deposited Mex$3,206,085,431 in an interest-bearing account on behalf of Industrias; and (5) Industrias

issued to CMI-Texas 3,207,177 shares (i.e., 100 percent) of newly issued class B stock.

On October 28, 1987, the market value of the debt interest was US$1,125,000, and the number of pesos the Mexican Government deposited into Industrias' account was computed based on the following formula:  The face value of the debt (i.e., US$2,300,000) multiplied by the market foreign exchange rate for pesos (i.e., Mex$1639.94/US$), discounted by the authorized rate (i.e., 15 percent).  On that day, the U.S.-dollar equivalent of the pesos deposited in the account was US$1,955,000.  Industrias was required to use the pesos in the account to purchase goods and services provided by residents of Mexico.  Prior to disbursement of the pesos, the Mexican Government required Industrias to make formal written requests, thus ensuring that the pesos would finance previously approved operations.  In addition, Industrias' class B stock was subject to restrictions (i.e., CMI-Texas' rights to transfer, redeem, convert, and receive guaranteed dividends relating to, the stock were curtailed).

On its consolidated Federal income tax return for the year ended May 31, 1988, petitioner did not report any gain relating to the swap transaction.  Respondent determined that petitioner recognized a taxable gain of $830,000 (i.e., the amount realized

of US$1,955,000 minus the debt interest's basis of US$1,125,000) relating to the transaction.

OPINION

The tax consequences of the transaction depend on its proper characterization. Generally, taxpayers are bound to the form of their transaction. See, e.g., Estate of Durkin v. Commissioner, 99 T.C. 561, 571-572 (1992). In North Am. Rayon Corp. v. Commissioner, 12 F.3d 583, 587 (6th Cir. 1993), affg. T.C. Memo. 1992-610, the U.S. Court of Appeals for the Sixth Circuit, to which this case is appealable, adopted a rule set forth in Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), revg. 44 T.C. 549 (1965). Where the terms of a transaction are set forth in a written contract, the Danielson rule provides that a party to the contract may disavow the form of such transaction only with evidence that would allow reformation of the contract (e.g., to prove fraud or duress). See id. at 775. If the contract is ambiguous, however, the Danielson rule does not apply. See North Am. Rayon Corp. v. Commissioner, supra at 589.

Respondent contends that, pursuant to the Agreement, CMI-Texas acquired a debt interest, which it transferred to Industrias in exchange for stock. Respondent further contends that the Danielson rule prevents petitioner from challenging the terms, and petitioner is bound by the form, of the transaction. Petitioner contends that, based on the substance of the

transaction, CMI-Texas paid US$1,125,000 for the rights to the peso account and did not acquire a debt interest. Petitioner further contends that the Agreement is ambiguous and that the proper characterization of the transaction should be determined by considering the events occurring after the parties executed the Agreement.

The terms of the transaction unambiguously provide that CMI-Texas acquired a debt interest, which it transferred to Industrias in exchange for stock. CMI-Texas agreed to these terms, and petitioner did not produce any evidence that would allow reformation of their agreement. Accordingly, pursuant to the Danielson rule, petitioner may not disavow the form of the transaction and must accept the tax consequences resulting therefrom. See generally Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971) (indicating that the Tax Court will generally follow the law as stated by the Court of Appeals in the circuit to which the case is appealable).

Section 1001(c) provides that taxpayers generally recognize gain realized on the sale or exchange of property. Though section 351(a) allows the tax-free exchange of property from a shareholder to its wholly owned subsidiary, section 367(a) may deny such treatment if the transfer is from a domestic to a foreign corporation. CMI-Texas' transfer of its debt interest in

exchange for Industrias' stock falls within the scope of section 367(a).

Respondent contends that petitioner received stock with a value of US$1,955,000 (i.e., equal to the U.S.-dollar equivalent of the pesos) and transferred a debt interest with a basis of US$1,125,000. Respondent further contends that the gain realized, $830,000 (i.e., US$1,955,000 minus US$1,125,000), must be recognized pursuant to sections 1001(c) and 367(a). Petitioner contends that CMI-Texas did not realize gain on the transfer because the fair market value of the stock received equaled the basis of the debt interest transferred. Petitioner alternatively contends that, if CMI-Texas did realize gain, the amount of gain recognized is, pursuant to section 1.367(a)-1T(b)(3)(i), Temporary Income Tax Regs., 51 Fed. Reg. 17939 (May 16, 1986), limited to zero because the debt interest was not appreciated property.

Assuming arguendo that CMI-Texas realized gain on the transaction, we agree with petitioner that the amount of recognized gain is limited to zero. Section 1.367(a)-1T(b)(3)(i), Temporary Income Tax Regs., provides that the gain recognized under section 367(a) "shall in no event exceed the gain that would have been recognized on a taxable sale of those items of property if sold individually". The regulation includes the gain limitation to "[ensure] that the gain recognized under

section 367(a) upon a transfer of appreciated property is not greater than the gain that would be recognized on a normal taxable exchange."  Id. 51 Fed. Reg. 17937 (May 16, 1986).  We also note that the legislative history accompanying amendments to section 367 provides that section 367(a)'s "aim is to prevent the removal of appreciated assets or inventory from U.S. tax jurisdiction prior to their sale".  H. Rept. 94-658, at 242 (1975), 1976-3 C.B. (Vol. 2) 695, 934; S. Rept. 94-938, at 264 (1976), 1976-3 C.B. (Vol. 3) 49, 302; see also H. Rept. 98-432 (Part 2), at 59 (1984) (referring to section 367 as "rules governing transfers of appreciated property abroad"); S. Rept. 665, 72d Cong., 1st Sess. 26 (1932), 1939-1 C.B. (Part 2) 496, 515 (stating that the section's purpose was to close the "serious loophole" available to domestic taxpayers transferring abroad property with "large unrealized profits").

CMI-Texas did not transfer appreciated property.  On the date of the transfer, the basis of the debt interest was US$1,125,000 (i.e., the amount CMI-Texas paid to Mellon), and, as respondent acknowledges, "Had * * * [CMI-Texas] just exchanged the MPD [debt interest] on the open market, * * * [CMI-Texas] and thus Industrias would have only received US$1,125,000 worth of MXP [pesos]."  Thus, a taxable sale of the debt interest would not have resulted in any gain.  Accordingly, pursuant to section 367(a) and section 1.367(a)-1T(b)(3)(i), Temporary Income Tax

Regs., petitioner did not recognize any gain relating to the swap transaction.

All other contentions that have not been addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioner</u>.